FILED
SEP 24 2026
CLERK U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY DEPUTY CLERK

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

JAMIE OSUNA BD0868
CSP-COR P.O. Box 8800
Corcoran, CA 93212,

Plaintiff,

v.

WOODCUT MEDIA, LTD.; WOODCUT INTERNATIONAL LTD.; FILMRISE ACQUISITIONS LLC d/b/a FILMRISE; LINA HAJI; ETHAN WILEY; JOELLE RENE CASTELLANO; PAUL LOPEZ; and DOES 1-75,

Defendants.

No. 1:25-cv-01437-~~KES-FJS PC~~

**FIRST AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**

1. Copyright Infringement - 17 U.S.C. §§ 101 et seq
2. Defamation - California Civil Code §§ 44-46
3. Civil Conspiracy - Joint Liability for Defamation Alleged in Count Two

**DEMAND FOR JURY TRIAL**

RECEIVED
SEP 24 2026
CLERK U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
DEPUTY CLERK

## I. JURISDICTION AND VENUE

1. This Court has original jurisdiction under 28 U.S.C. §§ 1331 and 1338 because Plaintiff asserts claims under the Copyright Act, 17 U.S.C. §§ 101 et seq. This Court has supplemental jurisdiction under 28 U.S.C. § 1367 because Plaintiff's California-law claims arise from the same Episode, production, publication, and distribution.

2. Venue is proper under 28 U.S.C. §§ 1391(b) and 1400(a). Plaintiff is housed in this District; 19CM-1882 is pending in Kings County, within this District; WOODCUT MEDIA contacted Plaintiff here before publication; Defendants distributed or made the Episode available here; and Plaintiff alleges injury here. Each Defendant purposefully directed the alleged conduct toward California by participating in, producing, supplying content for, distributing, licensing, promoting, or monetizing an Episode about a California prisoner, California criminal cases, California correctional institutions, and alleged events in California, knowing the Episode would be distributed in California. HAJI and WILEY knowingly supplied Plaintiff-specific statements concerning a California prisoner, California custody, and alleged California events for use in a nationally distributed Episode they understood would be published in California.

3. WOODCUT MEDIA deliberately produced the series containing the Episode for FILMRISE, a United States co-producer and North American distribution partner, and supplied the Episode for commercial distribution in North America, including California. Plaintiff's claims against WOODCUT MEDIA arise from those acts. Jurisdiction over WOODCUT INTERNATIONAL is based only on that entity's own alleged conduct and, as to Count One, the alternative basis pleaded under Federal Rule of Civil Procedure 4(k)(2).

4. Alternatively, as to Count One, Plaintiff invokes Federal Rule of Civil Procedure 4(k)(2) against either foreign Woodcut Defendant that is not subject to jurisdiction in any State's courts of general jurisdiction. Count One arises under federal law, and Plaintiff alleges that the Defendant's own aggregate contacts with the United States—including its production, licensing, delivery, or commercial exploitation of the Episode through a United States co-production and North American distribution arrangement—make the exercise of jurisdiction consistent with the Constitution and laws of the United States.

## II. INTRODUCTION

5. Plaintiff Jamie Osuna is a California state prisoner housed at California State Prison, Corcoran, and is the defendant in Kings County Superior Court case number 19CM-1882, a pending pretrial felony matter arising from an alleged 2019 incident at CSP-Corcoran. That case has not had its preliminary hearing, and Plaintiff has not been convicted in it.

6. This action arises from Defendants' production, publication, distribution, promotion, and monetization of a true-crime documentary episode concerning Plaintiff, released under varying titles including World's Most Evil Prisoners, "Jaime Osuna," World's Most Dangerous Prisoners, "Osuna," and "The Dark World of Jaime Osuna." Plaintiff refers to all versions, clips, previews, trailers, thumbnails, metadata, platform listings, promotional materials, and licensed distributions as the "Episode."

7. Plaintiff alleges Defendants published false and misleading factual statements and implications and used Plaintiff's copyrighted drawings and writings, including works registered under U.S. Copyright Registration No. TXu 2-471-802, without authorization.

8. Plaintiff does not challenge Defendants' right to report public facts, express opinions, criticize

Plaintiff, or produce true-crime programming. Plaintiff challenges the specific false factual statements and implications identified below, false representations of firsthand, correctional, investigative, or professional knowledge, and unauthorized uses of Plaintiff Works.

9. Before publication, WOODCUT MEDIA contacted Plaintiff seeking a "360 overview" of his case, but Plaintiff did not participate. WOODCUT MEDIA separately sought Kern County Sheriff's Office ("KCSO") records while describing the production as concerning "the world's most dangerous prisoners", stating its hope was to help keep "dangerous criminals such as Osuna behind bars."

10. WOODCUT MEDIA relied on HAJI, WILEY, CASTELLANO, and LOPEZ while allegedly omitting material limitations concerning personal knowledge, source basis, documentation, bias, prior inconsistent statements, and hearsay bearing on the Challenged Statements.

11. WOODCUT MEDIA produced, narrated, edited, and initially published the Episode. FILMRISE co-produced, acquired, licensed, uploaded, promoted, distributed, or republished the Episode according to its actual role, including through its North American channels and distribution network.

## III. DEFINITIONS

12. "Plaintiff Works" means Plaintiff's original drawings and writings registered with the United States Copyright Office under Registration No. TXu 2-471-802.

13. "WOODCUT MEDIA" means WOODCUT MEDIA, LTD.; "WOODCUT INTERNATIONAL" means WOODCUT INTERNATIONAL LTD. Allegations concerning production, interviews, narration, editing, and source selection refer to WOODCUT MEDIA. WOODCUT INTERNATIONAL is alleged liable for its own sales, licensing, or publication conduct identified in this Complaint, not solely because of corporate affiliation.

14. "Episode" means the documentary episode about Plaintiff released under titles including "World's Most Evil Prisoners," "World's Most Dangerous Prisoners," "Osuna," "Jaime Osuna," and "The Dark World of Jaime Osuna," including all versions, clips, previews, trailers, thumbnails, metadata, promotional materials, and licensed distributions.

15. "Interviewee Defendants" means HAJI, WILEY, CASTELLANO, and LOPEZ.

16. "Publisher Defendants" means WOODCUT MEDIA, LTD., WOODCUT INTERNATIONAL LTD., FILMRISE ACQUISITIONS LLC d/b/a FILMRISE, and DOES 1-75.

17. "Challenged Statements" means the specific statements and factual implications identified in Count Two, including implications created by source descriptions, narration, editing, sequencing, captions, titles, visuals, and the final audiovisual context.

18. "19CM-1882" means Kings County Superior Court case number 19CM-1882, which remains pending and pretrial.

19. "Peña case" means the Kern County Superior Court criminal case concerning Yvette Peña in which judgment was entered in 2017 following a plea.

## IV. PARTIES

20. Plaintiff Jamie Osuna is housed at California State Prison, Corcoran.

21. WOODCUT MEDIA, LTD. and WOODCUT INTERNATIONAL LTD. are related United Kingdom companies with the same registered address. Public corporate records identify WOODCUT MEDIA as owning at least seventy-five percent of WOODCUT INTERNATIONAL's shares and voting rights and holding the right to appoint or remove directors. WOODCUT MEDIA produced the series for Channel 5 and FILMRISE; FILMRISE participated as a United States co-producer and North American distributor; and WOODCUT INTERNATIONAL handled international sales. Each Woodcut Defendant is alleged liable only for acts undertaken in its own role.

22. FILMRISE ACQUISITIONS LLC d/b/a FILMRISE is a New York limited liability company that acquired, licensed, distributed, displayed, uploaded, promoted, monetized, or controlled the Episode in the United States or North America.

23. Lina HAJI appeared in the Episode as a forensic-psychology or mental-health source and is believed to reside in Miami, Florida.

24. Ethan WILEY appeared in the Episode as a former-inmate source and is believed to reside in Flower Mound, Texas.

25. Joelle Rene CASTELLANO is Plaintiff's former wife, appeared in the Episode as "Jane Doe," and is believed to reside in Bakersfield, California.

26. Paul Damon LOPEZ appeared in the Episode as a private-investigator and former correctional-officer source. LOPEZ publicly conducts and promotes his private-investigation business through Raptor Investigations and Protection Services, Inc., and resides, works, or regularly transacts business in Bakersfield, California.

27. DOES 1-75 are unknown persons or entities that participated in producing, publishing, licensing, distributing, promoting, monetizing, maintaining, or controlling the Episode.

## V. FACTUAL ALLEGATIONS

### A. Episode, Verification, and Source Framing

28. Public records reflect that judgment was entered in the Peña case in 2017 following a plea.

29. Plaintiff is also charged in 19CM-1882, which remains pending and pretrial and has not had its preliminary hearing. Plaintiff is proceeding on a not-guilty plea.

30. This action does not seek to invalidate, relitigate, or obtain review of the Peña judgment or to obtain an adjudication of the pending charges in 19CM-1882. It concerns Defendants' own statements, factual implications, source representations, editing, publication conduct, and unauthorized uses of Plaintiff Works.

31. WOODCUT MEDIA released the Episode in or around 2024, and Defendants thereafter distributed, promoted, or made it available through streaming, online video, television, and licensed distribution channels.

32. WOODCUT MEDIA and FILMRISE promoted the Episode as factual true-crime programming concerning Plaintiff.

33. Before publication, WOODCUT MEDIA contacted Plaintiff seeking participation in a documentary concerning "prisoners and their lives, crimes, and journeys through the prison system" and seeking a "360 overview" of Plaintiff's case. Plaintiff did not participate. A copy of WOODCUT MEDIA's correspondence is attached as Exhibit A.

34. WOODCUT MEDIA separately sought KCSO records concerning Plaintiff, described the production as concerning "the world's most dangerous prisoners," and stated its hope was to help keep "dangerous criminals such as Osuna behind bars." KCSO responded that it possessed no Peña-case records and would not disclose Plaintiff's incarceration records. The complete

exchange is attached as Exhibit B.

35. WOODCUT MEDIA also published a source-solicitation post seeking anyone who had previously served time with Plaintiff or the other listed prisoners. Plaintiff was listed first. A copy is attached as Exhibit C.

36. Publisher Defendants presented the specific Challenged Statements identified below as factual and as supported by persons cast in spouse or firsthand, former-inmate or eyewitness, correctional or investigative, and forensic-psychology roles. Plaintiff alleges that the sources' actual knowledge and limitations differed materially from the knowledge and corroboration conveyed by the final edit.

37. Plaintiff does not challenge a fair and true report of a public court record or official proceeding. Plaintiff challenges the specific false statements and materially false factual implications identified in Count Two, including fabricated personal communications and eyewitness accounts. Rhetorical labels such as "dangerous," "evil," "feared," and "depraved" are pleaded only for context, intended meaning, fault, and relief, not as standalone defamation claims.

38. WOODCUT MEDIA selected and interviewed the sources, possessed the raw interviews and prepublication communications, wrote the narration, and controlled the editing and sequencing. FILMRISE is alleged liable only for its own acquisition, active uploading, licensing, promotion, distribution, or republication of a version containing a Challenged Statement, and for its own unauthorized reproduction, display, distribution, licensing, or monetization of Plaintiff Works.

**B. HAJI**

39. HAJI appeared in the Episode as a forensic-psychology or mental-health authority concerning Plaintiff's alleged psychological condition, motives, dangerousness, and rehabilitative prospects.

40. HAJI had not interviewed, examined, tested, or evaluated Plaintiff. Her professional identification and placement in the Episode are relevant to the meaning and apparent corroboration of the specific factual representations challenged. Plaintiff does not allege that the absence of an examination, standing alone, makes professional commentary defamatory or that a diagnosis is false. Nothing in this Complaint alleges or concedes that HAJI accessed

Plaintiff's medical, mental-health, correctional, or criminal-case records.

41. HAJI publicly represented extensive work in prisons and forensic hospitals. After publication, she referred to Plaintiff's Episode while stating that some people cannot be rehabilitated and that someone like Plaintiff probably would not change. She promoted the series through professional accounts linked to Rise Psychological and later described filming additional WOODCUT MEDIA true-crime programs.

**C. CASTELLANO**

42. CASTELLANO is Plaintiff's former wife. WOODCUT MEDIA identified her as "Jane Doe" and used her as a principal source concerning the parties' relationship, alleged abuse, threats, contact, motive, and private background.

43. Through CASTELLANO's interview and its own narration, WOODCUT MEDIA presented accusations concerning the parties' relationship and alleged harm to a child. The child-harm accusation challenged in paragraph 78 is false because Plaintiff did not engage in the described conduct; the absence of a charge or conviction is not the basis for that denial. Plaintiff further alleges that an attorney retained by CASTELLANO testified under oath that she recanted a domestic-violence allegation and stated that she had made it while angry with Plaintiff. That recantation is alleged as source-credibility context.

44. Plaintiff alleges material contradictions between CASTELLANO's Episode statements and her prior interviews, public statements, and sworn testimony concerning the post-arrest Lerdo visits, communications, and admissions challenged in Count Two. WOODCUT MEDIA did not disclose those contradictions in the Episode.

45. Plaintiff disputes the specific CASTELLANO accounts challenged in Count Two concerning the alleged Lerdo visits, communications, gesture, and admissions. Her prior CDCR psychiatric-nursing employment is alleged as background supporting the inference that she understood how accusations of this nature could expose an incarcerated person to hostility and physical danger in custody. The Episode did not identify her as a correctional source. Plaintiff alleges that custodial danger explains the seriousness and foreseeable consequences of the false attributed admissions.

46. The Episode displays four photographs that Plaintiff identifies as his personal property and of which he previously possessed physical prints: Plaintiff wearing a vest in a hallway, drinking from a mug, against a wall, and shirtless. Plaintiff understood that at least the vest photograph was supposed to be with his grandmother. The Episode depicts photographs being reviewed in albums associated with CASTELLANO. Based on that presentation and her possession of his belongings after his arrest, Plaintiff alleges on information and belief that she possessed or controlled the physical prints supplied for the Episode. Plaintiff does not know when or how she obtained each print or whether the production used his particular prints or other copies. Plaintiff claims ownership of his physical prints, not copyright in the photographs merely because he appears in them.

**D. LOPEZ**

47. LOPEZ appeared in the Episode as a private investigator and former Kern County Jail correctional source with asserted law-enforcement experience, local knowledge, and familiarity with events concerning Plaintiff.

48. LOPEZ's publicly maintained professional profile states that his KCSO correctional-officer service ended in April 1998, and his KCSO deputy service ended in October 2007. Plaintiff entered Lerdo after his November 2011 arrest. LOPEZ therefore had no contemporaneous KCSO or Lerdo employment during Plaintiff's confinement. The Episode did not disclose that employment gap. His former employment, by itself, could not supply contemporaneous observation of Plaintiff's confinement.

49. KCSO disclosed no Peña-case or Plaintiff-incarceration records in response to the WOODCUT MEDIA request attached as Exhibit B. LOPEZ nevertheless supplied Plaintiff-specific accounts. In the Episode, he said that Plaintiff made the attributed remark to a gang coordinator and separately said that he personally reviewed a letter. Plaintiff does not allege that KCSO's response disproves those source claims or establishes that no other source existed. Plaintiff challenges the specific false factual accounts in Count Two and the contemporaneous knowledge conveyed by the editing described below.

50. WOODCUT MEDIA placed LOPEZ's statement that he spent most of his correctional career at

Lerdo immediately before his Plaintiff-specific statement that Plaintiff's "first stop" was "C Pod, Unit 3," a psychiatric unit. That sequence conveyed contemporaneous personal or official knowledge derived from LOPEZ's Lerdo employment. The Episode did not disclose the employment gap or identify the source of the C Pod statement.

51. After publication, LOPEZ promoted the Episode and later seasons through his private-investigation business and LinkedIn, incorporated the series into his professional branding, and represented that he returned in a recurring law-enforcement or media role.

**E. WILEY**

52. WILEY appeared as a former-inmate source with alleged personal knowledge of Plaintiff at Lerdo and CSP-Corcoran, including alleged access to Plaintiff's cell and face-to-face contact while performing inmate work.

53. Plaintiff alleges he never met, spoke with, or personally encountered WILEY at Lerdo or CSP-Corcoran. Plaintiff further alleges that, in his particular Lerdo housing area, staff rather than inmate workers distributed and collected trays. General Lerdo materials contemplate supervised inmate-worker participation in some meal passes elsewhere, but assign cell-door and food-port control to staff. No identified record places WILEY in Plaintiff's unit, assigns him meal-pass duties there, or authorizes the cell access and repeated face-to-face contact portrayed in the Episode.

54. WOODCUT MEDIA portrayed WILEY as transferring to Corcoran in the same year as Plaintiff. CDCR's disclosed admission, transfer, parole, and discharge entries identify WSP and SATF and do not identify a placement at CSP-Corcoran. WILEY's own public social-media materials identify inmate work at SATF rather than CSP-Corcoran. Copies are attached as Exhibits D and E.

55. Although WILEY stated only that he "ended up at Corcoran prison," WOODCUT MEDIA combined that statement with Plaintiff's placement chronology and the Episode's narration and sequencing to convey that WILEY had been housed with Plaintiff at CSP-Corcoran and possessed corresponding firsthand knowledge.

56. WILEY's June 16, 2023, public post announced his participation in the documentary. In the

associated comment thread, he described Plaintiff as "a person I used to know," stated that he had been the only inmate with face-to-face interaction with Plaintiff, and repeated his claimed tray-access role. Later comments announced that Plaintiff's Episode was available on FilmRise and that another season had been approved. The post and thread are attached as Exhibit F.

**F. Scope of Pending Criminal Matter**

57. The Episode acknowledged that 19CM-1882 remained pending and that Plaintiff was pleading not guilty. Plaintiff does not allege that the Episode omitted all notice of the case's pending status. No Challenged Statement in Count Two seeks an adjudication of the alleged 2019 incident, and no statement by nonparty Hector "Bravo" Ferrel is asserted as a basis for relief in this action.

**G. Plaintiff Works**

58. Publisher Defendants used Plaintiff Works in the Episode and related platform and promotional materials.

59. Plaintiff owns copyrights in Plaintiff Works registered with the United States Copyright Office under Registration No. TXu 2-471-802, and Plaintiff Works are original works of authorship fixed in a tangible medium.

60. Publisher Defendants reproduced, displayed, distributed, promoted, licensed, streamed, or monetized Plaintiff Works without Plaintiff's authorization.

61. WOODCUT MEDIA's communications with Plaintiff did not request authorization to use Plaintiff Works. Publisher Defendants used the works as illustrative, dramatic, identity-related, or character-framing material, rather than to analyze or criticize the works themselves.

**H. Publication, Republication, and Timeliness**

62. Publisher Defendants published, licensed, distributed, displayed, uploaded, streamed, promoted, or monetized the Episode through different titles, episode numbers, release dates, runtimes, platform descriptions, thumbnails, clips, metadata, and platform listings.

63. The challenged publications include the original Episode and later active uploads, platform releases, re-releases, materially edited versions, promotional publications, licensed distributions, thumbnails, metadata, platform listings, and republications.

64. Plaintiff does not allege that passive continued availability or monetization of an unchanged publication creates a separate defamation claim. Later uploads, releases, edits, or promotional publications are alleged as separate defamatory publications only to the extent they repeat a Challenged Statement and constitute an actionable republication, including a publication directed to a new audience or a material change to the defamatory content. Other promotional conduct is alleged as evidence of participation, adoption, fault, or benefit, according to each Defendant's own acts.

**I. Harm**

65. Viewed as a whole, Defendants' presentation of the Challenged Statements as established and independently corroborated facts had a natural tendency to expose Plaintiff to hatred, contempt, ridicule, or obloquy, to cause him to be shunned or avoided, and to injure his reputation. The challenged falsehoods imposed distinct additional reputational stigma—including child abuse, fabricated admissions, ritualized trophy conduct, and falsely manufactured eyewitness or professional corroboration—beyond the sting of truthful public facts concerning Plaintiff. Plaintiff does not seek emotional-distress, medical, mental-health, treatment, medication, competency, classification, housing, transfer, or other custodial-decision damages and does not place those records at issue.

## VI. CLAIMS FOR RELIEF

### COUNT ONE: Copyright Infringement 17 U.S.C. §§ 101 et seq.

*Against Publisher Defendants*

66. Known unauthorized uses include reproduction and display of Plaintiff's original handwritten text and drawn designs on the correspondence shown at approximately 30:35 and 30:54 in the FilmRise YouTube-channel version. Plaintiff claims the original expression in those writings and drawings covered by Registration No. TXu 2-471-802, not preexisting photographs, underlying facts, or artwork from other sources excluded from that registration. Plaintiff alleges on information and belief that the same or substantially similar uses appear in other platform-specific or downstream versions, with exact versions, cuts, runtimes, timestamps, and distribution paths in Defendants' possession.

67. Plaintiff owns copyrights in Plaintiff Works registered under U.S. Copyright Registration No. TXu 2-471-802, also reflected as TXu002471802, effective February 26, 2025.

68. Plaintiff Works are original works of authorship fixed in a tangible medium of expression.

69. Publisher Defendants had access to Plaintiff Works before or during production of the Episode.

70. Publisher Defendants copied, reproduced, displayed, distributed, streamed, uploaded, licensed, promoted, monetized, or otherwise used Plaintiff Works in the Episode.

71. Plaintiff did not authorize those uses. Publisher Defendants used the works for their original expressive and illustrative content as dramatic, identity-related, and character-framing material in a commercial documentary. Plaintiff challenges the copying of his original expression, not the reporting of underlying facts. His infringement claim concerns the particular material copied, the purpose and extent of its use, and the alleged loss of licensing value; it does not rest solely on the absence of criticism of the works themselves.

72. According to their respective roles, WOODCUT MEDIA produced and supplied versions containing Plaintiff Works; FILMRISE co-produced, acquired, uploaded, licensed, distributed, displayed, promoted, or monetized North American versions; and WOODCUT INTERNATIONAL handled international sales or licensing of versions containing Plaintiff Works. Count One seeks relief for acts infringing rights protected by the United States Copyright Act, not solely for exploitation occurring entirely outside the United States.

73. Publisher Defendants acted intentionally and, on information and belief, willfully because they knew or recklessly disregarded that their uses of Plaintiff Works were unauthorized and infringing.

74. The infringement caused loss of control over Plaintiff Works, unauthorized exploitation, loss of licensing value, actual damages, and profits attributable to the infringement according to proof.

## COUNT TWO: Defamation—Libel, Libel Per Se, Slander, Slander Per Se, and Defamation by Implication; California Civil Code §§ 44–46

*Against Publisher Defendants; HAJI; WILEY; CASTELLANO; and LOPEZ*

75. Each Interviewee Defendant supplied and authorized publication of that Defendant's own Challenged Statements. Publisher Defendants published them to third persons and are alleged

liable for their own narration and factual statements, for adopting and republishing the Interviewee Defendants' statements, and for additional defamatory implications created by editing, sequencing, source descriptions, captions, visuals, titles, descriptions, thumbnails, and the final audiovisual context. These theories do not seek duplicative recovery for the same injury.

76. The Challenged Statements were of and concerning Plaintiff, false, unprivileged, and reasonably susceptible, to the average viewer considering the Episode as a whole, of the defamatory meanings pleaded below. Accusations of crimes constituted defamation per se. The remaining statements and implications were defamatory on their face because the harmful meanings arose from the publication itself without reliance on undisclosed extrinsic facts. Defendants acted at least negligently and, where required, with knowledge of falsity or reckless disregard for truth.

77. WOODCUT MEDIA selected and interviewed the sources, wrote the narration, and edited and sequenced the Episode to present the Challenged Statements as eyewitness-supported, correctional, investigative, or professionally corroborated facts. Each other Publisher Defendant is alleged liable for its own publication or republication and its own required degree of fault. Fault is alleged from each Interviewee Defendant's knowledge of that Defendant's own contact, observation, or communication, and from WOODCUT MEDIA's source communications and deliberate presentation of the factual accounts described below.

78. WOODCUT MEDIA narrated and published that Plaintiff "turned his violent behavior" on CASTELLANO's son by pushing him from a bed. This was false. Plaintiff did not push or harm the child as alleged in that account. The accusation was defamatory on its face. (TS 00:12:20.)

79. WILEY and WOODCUT MEDIA falsely represented that WILEY personally met Plaintiff and had regular face-to-face contact with him at Lerdo. WILEY used that claimed relationship as the factual premise for stating that Plaintiff was "the most dangerous person I've ever met," and publicly repeated that he knew or had met Plaintiff and was the only inmate with face-to-face access. Plaintiff never met WILEY. The challenged falsity is the claimed personal contact and

corresponding firsthand knowledge, not "most dangerous" as a standalone opinion. Those false representations caused WILEY's statement to appear grounded in personal observation rather than secondhand information. This constituted defamation by implication by WILEY and Publisher Defendants. (TS 00:00:31; 00:29:41; 00:29:47; 00:37:31-00:37:56; 00:40:36.)

80. WOODCUT MEDIA narrated that WILEY accompanied a guard to Plaintiff's cell and "discovered the satanic symbols and pentagrams within." WILEY then described in the first person his boss stepping into "that cell," thereby claiming personal presence at Plaintiff's cell. Those representations were false. WILEY was not present and lacked the placement, unit assignment, work assignment, or unit-cell access necessary for the claimed encounter. Through narration, sequencing, and credentialing, WOODCUT MEDIA and WILEY falsely presented WILEY as an independent inmate eyewitness who personally corroborated the Episode's portrayal that Plaintiff maintained satanic, pentagram, or blood-related markings in his cell. That false eyewitness corroboration materially increased the credibility and defamatory force of the Episode's ritualized-conduct portrayal. Plaintiff challenges the false claimed presence, access, and eyewitness corroboration—not the guard's alleged reaction as a standalone opinion and not whether any unidentified marking existed. This constituted defamation by implication. (TS 00:27:07-00:28:00.)

81. CASTELLANO stated that, during alleged post-arrest Lerdo visits, Plaintiff made statements concerning Peña's body and his actions after her death. This was false. Plaintiff made no such statements, and the alleged Lerdo visits and admissions did not occur as published. CASTELLANO's prior public interviews and sworn testimony materially differed concerning post-arrest contact and did not contain the alleged admissions. The challenged falsity is the attribution of those particular communications to Plaintiff, not the validity of the Peña judgment. The content is identified by speaker, subject, context, and timestamp without repeating its graphic details because republication risks further custodial danger. In context, the attributed admissions imputed additional criminal conduct and were defamatory on their face. (TS 00:21:50.)

82. Separately, and independently of the statements challenged in paragraph 81, the Episode

presented CASTELLANO's account of the alleged neck gesture as a factual admission by Plaintiff concerning conduct in the Peña case. Plaintiff made no such gesture or admission. The resulting factual implication was false, defamatory on its face in the context of the publication, and independently actionable as defamation by implication. (TS 00:23:17.)

83. LOPEZ stated that Plaintiff arranged Peña crime-scene photographs around a pentagram, used them as "trophies," and made a self-deifying statement concerning Peña. This was false. Plaintiff did not arrange Peña crime-scene photographs around a pentagram, use them as trophies, or make the attributed self-deifying statement. LOPEZ said Plaintiff made a statement "similar" to the one he recounted to a gang coordinator; Plaintiff denies making that statement and challenges the truth of the account, not merely the absence of supporting documentation. Viewed in the Episode's factual context, the statement was defamatory. (TS 00:26:30.) Immediately afterward, HAJI stated that "keeping these trophies, so to speak, definitely helped him achieve those goals." In context, that statement adopted the factual premise that Plaintiff kept the crime-scene photographs as trophies. That premise was false for the reasons stated above. Plaintiff challenges that factual representation, not HAJI's general psychological opinions or the truth or falsity of any diagnosis. This constituted defamation by implication. (TS 00:26:57.)

84. LOPEZ stated that Plaintiff killed and displayed a mutilated mouse in his cell for months. This was false. Plaintiff did not kill and display a mouse as described. LOPEZ's KCSO employment ended before Plaintiff's Lerdo confinement, so that employment did not provide contemporaneous personal observation of the alleged conduct. KCSO had informed WOODCUT MEDIA that it would not disclose the requested incarceration records. The published accusation was defamatory on its face. (TS 00:29:18; see ¶ 34 & Ex. B.)

85. HAJI's identification as a forensic-psychology source and her placement immediately after LOPEZ's account supplied the professional context for the false factual implication challenged in paragraph 83. Plaintiff challenges her adoption of the alleged trophy conduct as an event that occurred. Her broader comments about psychopathy, dangerousness, motives, or rehabilitation are alleged only as context and are not separate claims that a diagnosis or psychological opinion

is false. This claim does not require proof that Plaintiff has or lacks any mental-health diagnosis.

86. The publications described above were substantial factors in causing the reputational injury alleged in this Complaint.

**COUNT THREE: Civil Conspiracy - Joint Liability for Defamation Alleged in Count Two**

*Against WOODCUT MEDIA, LTD.; HAJI; WILEY; CASTELLANO; and LOPEZ*

87. Plaintiff alleges an agreement between WOODCUT MEDIA and each participating Interviewee Defendant to publish that Defendant's knowingly false factual contribution identified in Count Two. The alleged unlawful objective was publication of the false representations, not merely making or promoting a documentary. Plaintiff alleges that shared objective from the facts concerning each participant's own knowledge and contribution and WOODCUT MEDIA's coordinated source presentation described below. Plaintiff does not allege that the Interviewee Defendants separately agreed with one another or knew every aspect of the final edit. Count Three is a basis for joint liability for the defamation alleged in Count Two.

88. CASTELLANO knew whether the Lerdo visits, communications, gesture, and admissions challenged in Count Two occurred and knew her own prior accounts of those contacts. She nevertheless supplied the challenged accounts as firsthand facts and authorized WOODCUT MEDIA to publish them. Her prior correctional psychiatric-nursing employment supports the inference alleged in paragraph 45 concerning her awareness of custodial danger.

89. WILEY knew his own placements, work duties, unit access, contacts with Plaintiff, and whether his information came from personal observation, a statement attributed to a guard, or later rumor. He nevertheless supplied and authorized publication of the claimed cell access, face-to-face contact, eyewitness, and same-institution accounts. His public assertions that he knew or had met Plaintiff and was the only inmate with face-to-face access corroborate his adoption of the published role.

90. LOPEZ knew that his KCSO and Lerdo employment ended years before Plaintiff entered Lerdo and knew whether he later investigated Plaintiff or reliably reviewed supporting material. He nevertheless supplied and authorized publication of the pentagram/trophy/self-deifying and

mouse statements challenged in Count Two in the correctional and investigative role assigned by WOODCUT MEDIA.

91. HAJI knew what materials, if any, she reviewed and whether she had independently verified the alleged trophy conduct. She nevertheless supplied and authorized publication of the Plaintiff-specific statement quoted in paragraph 83 as an explanation of conduct treated as having occurred. Her professional identification and placement after LOPEZ's account conveyed adoption and professional corroboration of that factual premise. Plaintiff alleges participation in the agreement described in paragraph 87, not liability merely for appearing as a professional commentator or failing to examine Plaintiff.

92. WOODCUT MEDIA selected and interviewed the sources, possessed the raw interviews and prepublication communications, assigned or displayed their credentials, wrote the narration, and controlled the editing and sequencing. Those acts gave it direct knowledge of what each source claimed to know and the basis the source supplied. Plaintiff alleges that it knowingly presented the false firsthand accounts and factual corroboration identified in Count Two. Possession of raw interviews, ordinary editorial coordination, and KCSO's refusal to disclose records, standing alone, are not alleged to establish an unlawful agreement.

93. WOODCUT MEDIA sequenced LOPEZ's trophy account immediately before HAJI's statement adopting the keeping of trophies as a factual premise, and then introduced WILEY's purported cell-access account as eyewitness support for the cell portrayal. Plaintiff alleges that this editing conveyed separate factual corroboration of the accounts challenged in Count Two. HAJI's alleged contribution to the defamatory implication is her adoption of the trophy premise, not the mere expression of a psychological opinion.

94. WILEY publicly promoted his participation and repeated his claimed familiarity and face-to-face access in the post and thread attached as Exhibit F; a later comment announced the Episode's FilmRise availability. After publication, HAJI promoted the series and Episode clips through professional accounts and described filming additional WOODCUT MEDIA programs. LOPEZ promoted the series through his professional accounts and represented that he returned in a recurring role. These affirmative acts are alleged as corroborating evidence of adoption,

professional benefit, and continuing production relationships. The alleged unlawful agreement rests on the knowing false contributions and coordinated publication described above; Plaintiff does not rely on silence, non-objection, or ordinary participation in documentary production alone.

95. Defendants knew the truth or limitations of their own contributions and intended to assist publication of the challenged portrayal. Their conduct was knowing and malicious and, where applicable, in reckless disregard of the truth and in willful and conscious disregard of Plaintiff's rights, and was a substantial factor in causing Plaintiff's reputational injury.

96. On information and belief, the challenged publication and republication decisions of each corporate Defendant were authorized, approved, or ratified by an officer, director, or managing agent responsible for the relevant production, editorial, licensing, or distribution decisions.

## VII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests judgment in his favor and against Defendants as follows:

97. Compensatory, general, presumed, and nominal damages, including nominal damages of $1.00 where available, according to proof and to the extent permitted by law, including, for Rule 54(c) default-judgment notice purposes, up to $25,000,000 against Publisher Defendants, jointly and severally where permitted by law, and up to $5,000,000 against each liable Interviewee Defendant;

98. Punitive and exemplary damages on the California-law claims against each Defendant whose conduct is proven by clear and convincing evidence to constitute malice, oppression, or fraud, including despicable conduct carried on with willful and conscious disregard of Plaintiff's rights, for the sake of example and by way of punishing that Defendant, including, for Federal Rule of Civil Procedure 54(c) default-judgment notice purposes, up to an additional $25,000,000 against each liable Publisher Defendant and up to an additional $5,000,000 against each liable Interviewee Defendant, with any punitive award separately assessed against each Defendant according to that Defendant's own conduct;

99. Copyright actual damages and an accounting and recovery of each infringer's additional profits attributable to infringement and not taken into account in computing actual damages under 17 U.S.C. § 504(b), including, for Federal Rule of Civil Procedure 54(c) default-judgment notice purposes, up to $10,000,000 in combined copyright actual damages and recoverable infringer profits against the liable Publisher Defendants, imposed and allocated only as permitted by law and without duplicative recovery; or, at Plaintiff's election and only to the extent legally available under 17 U.S.C. §§ 412 and 504(c), statutory damages of not less than $750 and not more than $30,000 per infringed work, increased up to $150,000 per infringed work upon proof of willful infringement; together with costs, attorney's fees, injunctive relief, impoundment, destruction, and other disposition under 17 U.S.C. §§ 502–505;

100. After final adjudication, permanent injunctive relief no broader than permitted by law: (a) prohibiting each liable Defendant from repeating the specific statements adjudicated false and defamatory; (b) requiring each liable Defendant to remove, disable Defendant-controlled posts, clips, previews, promotions, or listings that repeat adjudicated unlawful material; and (c) prohibiting continued reproduction, display, distribution, licensing, or monetization of Plaintiff Works adjudicated infringing;

101. Delivery of Plaintiff's particular physical photographic prints identified in paragraph 46, if found to be wrongfully withheld by CASTELLANO, to Plaintiff's lawful noncustodial designee through a Court-approved method, at an address provided after judgment or under seal, and not to Plaintiff's prison address;

102. An order requiring Publisher Defendants to notify platforms, licensees, distributors, aggregators, affiliates, promotional partners, and listing services of any judgment and to use reasonable efforts to remove adjudicated unlawful material, together with a corrective or retraction notice to the extent permitted by law;

103. Prejudgment and postjudgment interest, costs of suit, statutory fees, and litigation expenses where permitted by law;

104. Appropriate protective and case-management orders under Federal Rules of Civil Procedure 16, 26, 30, and 45, including phased discovery beginning with Defendants' source materials,

communications, publication records, and relevant placement or contact records; and, on a showing of good cause, redaction, in camera review, litigation-use-only treatment, and other protections for confidential, medical, correctional, and criminal-case information. Plaintiff seeks to avoid unnecessary inquiry into the merits of 19CM-1882 or the Peña judgment while preserving discovery the Court finds relevant and proportional to the claims or defenses; and

105. Any other relief the Court deems just and proper.

## VIII. JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

September 21, 2026

p.p. Jamie Osuna

## EXHIBITS

### TABLE OF CONTENTS — EXHIBITS ONLY

Exhibit A — WOODCUT correspondence seeking Plaintiff's participation .....22

Exhibit B — WOODCUT- Kern County Sheriff's Office correspondence........23

Exhibit C — WOODCUT source-solicitation Facebook post ...........................24

Exhibit D — CDCR response re WILEY's facility history ...............................25

Exhibit E — WILEY public social-media re SATF placement ..........................26

Exhibit F — WILEY public post re Episode ....................................................27

*Note: Redactions are limited to identifying or contact information of non-defendants. Any cropping, enlargement, or repositioning is solely for readability and visual aid; no substantive exhibit content has been altered or modified.*

# EXHIBIT A

Osuna, Jaime, CDC#BD0868
California State Prison, Corcoran
P.O. Box 8800
Corcoran, CA, 93212-8309
UNITED STATES

23rd February 2023

Hi Jaime,

I'm Liam and I work for a TV company called Woodcut Media, one of the leading producers of true crime documentaries in the UK.

We also produce programmes for a wide range of US broadcasters including Discovery, National Geographic, A&E, Oxygen, Sky and Prime Video.

We're currently in production for a brand-new documentary series which focuses on prisoners and their lives, crimes, and journey through the prison system.

In our upcoming series, we intend to feature your story and will be interviewing several people related to your case including friends, relatives, experts, journalists, and members of law enforcement.

We would like to produce a real 360 overview of your case and it would be great to have you involved. We are aware of California's prison policy which prohibits news media from visiting and filming inmates so we would potentially look at conducting a phone interview with you.

I look forward to hearing from you.

Best,
Liam

# EXHIBIT B

**Sent:** 05/05/2023 10:34 AM
**To:** robert.kilburn@woodcutmedia.com
**From:** "MaryClaire Walsh (Kern County Sheriff, CA)"
**Subject:** RR-2023-183 Records Request Dated: 4/27/2023

***SHERIFF'S OFFICE - COUNTY OF KERN***
***DONNY YOUNGBLOOD***
***Sheriff-Coroner Public Administrator***
***1350 Norris Road***
***Bakersfield, CA 93308-2231***

---

Dear Mr. Kilburn:

Please consider this email the Kern County Sheriff's Office response to your 4/27/2023 request for records. For reference your request is set forth below:

- I'm a researcher for a U.K based factual T.V production company. I'm currently working on a broadcast documentary series that looks at a number of the worlds most dangerous prisoners. For this I am looking into the case of Jamie Osuna. Who murdered Yvette Pena in 2011 and was housed at Kern County Jail. I'd like to request his arrest records, bodycam, CCTV, police interviews, audio, 911 calls, photographs, archive material and any relevant documents relating to this case. I'd like to request any other information available related to his incarceration that you have on record. Our hope with this series is to highlight some of the fantastic work your department does and to help keep dangerous criminals such as Osuna behind bars. Thank you we appreciate and look forward to your co-operation. Many thanks, Rob.

The KCSO has no records related to the murder of Yvette Pena. You may wish to reach out to the Bakersfield Police Department for the records you seek. As to records related to the incarceration of Jamie Osuna, records of criminal history information are confidential and therefore exempt from disclosure pursuant to California Government Code § 7927.705, Cal. Const. Art. I § 1, and California Penal Code § 13300, and Evidence Code § 1040. Based on the foregoing, no records will be disclosed.

With the transmission of this response letter, the KCSO will consider its response to your request completed. If you have any questions please feel free to contact me.

MaryClaire Walsh
Civil Litigation Coordinator
[redacted]

# EXHIBIT C

**Prisoners Of The United States**
Wood Cut · April 3, 2023 ·

Hi everyone, my name is Liam and I work for a TV production company based in the UK called Woodcut Media.

I was hoping to speak with anyone who has previously served time with any of the following prisoners:

- **Jaime Osuna #BD0868**
- **Jason Budrow #V27146**
- **Tyler Bingham #03325-091**
- **Christa Pike #261368**
- **Fotios Geas #05244-748**
- **Edward Mohammed Johnson #174269**
- **James Robertson #322534**

If you have we would like to talk to you about your experience and a new programme we're currently in production for.

My email address is: liam.clark@woodcutmedia.com

(ADMIN PLEASE DELETE IF INAPPROPRIATE)

1

Source:

https://www.facebook.com/groups/244475937033667/?multi_permalinks=769799671167955

# EXHIBIT D

On 12/27/2024 2:50:17 PM, CDCR Public Records wrote:

**Subject: [Records Center] Data Concierge Service ::** [redacted]
**Body:**

RE: PUBLIC RECORDS ACT REQUEST December 24, 2024, Reference # [redacted]

Dear [redacted]

This letter is in response to your Public Records Act request dated December 24, 2024 in which you requested the following records:

**"I am doing fact checking research in regards to former CDCR inmate interviewees. I would like to confirm whether Ethan Rene Wiley former CDCR # BE6607 was ever an inmate at Corcoran State Prison in 2018, 2019. What dates and other CDCR facilities was he held under booking # BE6607, and if its possible to know in what building yards or level for each facility he was held in."**

Your request has been referred to me for response. I have located the record for CDCR number BE6607. Below please find the incarceration and release dates. Unfortunately, we are unable to release the housing information without a valid written authorization from the discharged person.

| | | |
|---|---|---|
| 11/03/2017 | WSP | Admitted Offender with New AOJ |
| 03/14/2018 | SATF | Received from another Facility |
| 11/21/2022 | SATF | Paroled |
| 11/21/2023 | Interstate | Discharged (from Parole) |

If you have any questions or need additional information, you can manage your request through the CDCR PUBLIC RECORDS PORTAL.

Sincerely,

L[redacted]

Powered by GovQA

Page 2

# EXHIBIT E







Source: https://www.facebook.com/photo.php?fbid=123598793926727

# EXHIBIT F

**Ethan Wiley's Post**

**Ethan Wiley**
June 16, 2023 ·

Well, its official, I get to be in a documentary!

46

Most relevant

**Ethan's Post**

**Ethan Wiley** · 3y
The documentary will be on Discovery+ and a few other streaming platforms from what I understand. It is about a person I used to know whos fairly infamous, and was in custody as an permanent ad seg single cell inmate. Which means he was kept away from every other person and only was supposed to have interactions with police. I was the head porter/trustee at that facility, and was allowed to bring him his food, so I am literally the only inmate who had face to face interaction with him during this time. Not only this, but I was at the same prison as him when he committed some seriously sick crimes. Look up the man with a thousand faces.\

14

**Ethan Wiley** · 1y
Sorry for the late update everyone, there were some issues with the streaming services and it is up on the FilmRise app, episode 1, The Man of a Thousand Faces.

3

**Ethan Wiley** · 1y
Also, I recieved word that season 2 is now officially approved! Fingers crossed!

2

Source:

https://www.facebook.com/ObeliskThyTormentor/posts/pfbid032VmW2yv6WfmCvJZEFmFGhTRWmAMnszkBb9ogoWUQvSN92NuBRpZ3sPdL5c77qPcfl